Filed 5/11/22  P. v. Zaragoza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JIMMY YZQUIERDO ZARAGOZA,<br><br>    Defendant and Appellant. | F080295<br><br>(Super. Ct. No. 17CMS4395A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

Siena Micol Kautz and Devon Stein, under appointments by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jimmy Zaragoza was convicted of attempted voluntary manslaughter, attempted robbery, resisting a peace officer, and possession of burglary tools.  All of the offenses arose from an incident in which he and his co-defendant, Cesar Joshua Pinon,

unsuccessfully tried to rob a man whom Pinon then shot.[1] Zaragoza was convicted of attempted voluntary manslaughter on an aiding and abetting theory. The jury found true gang enhancement and firearm enhancement allegations. Zaragoza was sentenced to an aggregate term of 13 years to life in prison.

Zaragoza raises numerous issues on appeal. He also joins in several of the issues Pinon raises. We conclude that, due to recent legislative enactments that took effect while his appeal was pending, Zaragoza is entitled to a remand for resentencing. We further conclude that, due also to a recent change in the law, the jury's findings on the gang enhancement allegations must be vacated and the matter remanded for the prosecution to choose to either retry the allegation or accept a sentence reduction. Accordingly, we partially reverse the judgment.

## STATEMENT OF THE CASE

On March 23, 2018, the Kings County District Attorney filed an information charging Zaragoza with attempted premeditated murder (Pen. Code, §§ 664/187, subd. (a); count 1),[2] attempted second degree robbery (§§ 664/211; count 2), misdemeanor resisting or delaying a peace officer (§ 148, subd. (a)(1); count 4), and misdemeanor possession of burglary tools (§ 466; count 5).[3] As to counts 1 and 2, it was alleged that a principal personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), (d) & (e)) and that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).

---

[1] Zaragoza was tried with his co-defendant, Pinon, who was also convicted of various offenses arising out of the same incident. Pinon's appeal is addressed in a separate opinion, our case number F080327.

[2] Undesignated statutory references are to the Penal Code.

[3] Pinon was charged with Zaragoza in counts 1, 2, 4, and 5, and was also charged with resisting an executive officer (§ 69; count 3) and personally and intentionally discharging a firearm causing great bodily injury (§ 12022.53, subd. (d)).

2.

On September 30, 2019, a jury was empaneled to try the case. On October 7, 2019, the jury found Zaragoza guilty of attempted voluntary manslaughter (§§ 664/192, subd. (a)), a lesser included offense to count 1, and guilty on counts 2, 4, and 5. The jury found true the gang enhancement and the section 12022.53, subdivision (b) firearm enhancement allegations in counts 1 and 2.

On November 5, 2019, the court sentenced Zaragoza to an aggregate term of 13 years in state prison, calculated as follows: the upper term of three years for attempted robbery (count 2) plus 10 years for the firearm enhancement. On count 1, the court imposed and stayed pursuant to section 654 the upper term of five years, six months plus five years for the gang enhancement. The court imposed 180 day terms on each of the two misdemeanors counts, to be served concurrently.

Zaragoza filed his notice of appeal on November 6, 2019.

## FACTS

### I.     The shooting

B. was a 67-year-old retired schoolteacher.[4] On November 7, 2017, a little after 5:00 a.m., B. left his house on his morning bicycle ride. He rode his usual route, making laps around his neighborhood.

On the corner of 19th Avenue and Cedar, B. saw two young Hispanic men he had never seen before, talking on the sidewalk. He thought the two men may have been headed to an early morning practice because they looked athletic.

B. continued on his loop and saw the two men again on Lincoln Lane. It was unusual for B. to see anyone walking at that time of day and the men were dressed in all

---

[4] There was no direct evidence that B. was 67 years old. We obtained his age from a police report included in the clerk's transcript. The police report was not shown to the jury. However, B. testified that he taught for 38 years, and had been retired six years before the crimes in this case. Assuming he began teaching no earlier than his early twenties, the jury could easily determine he was at least in his mid-sixties at the time the crimes occurred.

black, which caught B.'s attention. The two men were looking around, so B. crossed the street to be cautious. One of them then walked diagonally across the street and approached B. The man, who B. later identified as Zaragoza, walked up and stood in front of B.'s bicycle. B. thought the two men might be lost and asked, "What's up?" Zaragoza replied, "Where's your wallet?" B. began looking for his wallet, thinking maybe Zaragoza had found it. When Zaragoza asked for it again, B. realized Zaragoza was not a good Samaritan and instead wanted his wallet. The second man was standing about 30 yards down the street, waiting and watching.

B. was shocked and angry and afraid Zaragoza was going to "jump on [him]." He told Zaragoza to get out of the neighborhood before he and his companion got in trouble. He looked at Zaragoza, who was standing five feet in front of him, straight in the eyes. Zaragoza did not reply, and B. decided the conversation was over and began pedaling away.

As B. was riding away, the other man, who B. later identified as Pinon, came charging up to B. B. stopped and got off his bicycle. He confronted Pinon and said, "What do you want? What are you going to do? Let's do it." Pinon backed off a little and looked around for Zaragoza. B. told Pinon, "Let's go, I'll kick your fucking ass right now if you want." Pinon backed away and B. got back on his bicycle and began riding away towards home.

As he pedaled away, B. looked back to see what the two men were doing. He saw Pinon and Zaragoza walking toward each other and heard Pinon tell Zaragoza, "Get my gun," or, "Where is the gun." B. saw Pinon standing next to Zaragoza with his back toward B. Pinon then turned around and pointed a black handgun at B. B. could see the barrel of the gun pointed at him. B. heard a bang and felt his arm go numb. He pedaled home as fast as he could, hoping he could make it home before he died.

B. went inside his house and said to his son, "Hey, I think I got shot." B.'s son saw blood all over the floor and his family called 911. B. was airlifted to Community

4.

Regional Medical Center in Fresno. The bullet entered the back of his shoulder and exited through his upper chest, but no major organs or arteries were damaged. There was no bullet found.

B. was not a gang member and did not live in a gang territory. B. did not know Pinon and Zaragoza were gang members. Neither Pinon nor Zaragoza made any gang signs or expressed any gang names during the attempted robbery or shooting.

## II.     The investigation

Lemoore Police officers responded to B.'s residence and provided first aid. Before B. was transported to the helicopter pad to be airlifted, he described the two suspects as Hispanic males wearing dark clothing. The police put a dispatch out about the shooting, and Lemoore Police Officer Jonathan Diaz saw Pinon and Zaragoza walking together wearing dark clothing. Diaz knew Pinon from prior contacts.

Diaz exited his marked patrol car and Zaragoza and Pinon went in separate directions. They ignored Diaz's commands to stop. Diaz focused on Pinon and radioed to other officers Zaragoza's direction of travel. Diaz told Pinon to stop, and Pinon continued to walk several feet before finally stopping. Pinon dropped the backpack he was wearing and began emptying his pockets, saying, "I don't have anything." Officer Diaz pointed his gun at Pinon because he knew a gun had been used in the crime.

Detective Jose Ambriz arrived several minutes later, and the officers were able to handcuff Pinon. There was a 12-pack of beer and some marijuana in Pinon's backpack, but officers never found a firearm. Diaz noticed Pinon was unbalanced and emitted a strong odor of alcohol and believed Pinon was too drunk to care for himself. Diaz arrested Pinon for public intoxication.

Diaz and Ambriz placed Pinon in the back of a police car, where Pinon began kicking and screaming. The officers took Pinon out and placed him in a different vehicle. Pinon told Diaz that if he [Diaz] was going to "act like that" with him, everyone was "going to pay." Pinon also told Diaz he knew his family and where they lived. Diaz took

5.

that as a threat because he was from Huron and knew Pinon was part of the Huron Park Side Nortenos criminal street gang, which he knew to be "very violent." The threat scared Diaz, and he took the threat to mean Pinon would hurt his family. Diaz turned his camera on and asked Pinon what he meant by the threat, and Pinon answered that that was all Diaz needed to know.

Another officer apprehended Zaragoza. Zaragoza's cell phone lock screen showed a picture of a red bandana folded in the shape of an N with a gun on top of the bandana. Pinon's and Zaragoza's hands were tested for gunshot residue. Particles were found on Pinon's hands but not on Zaragoza's.

Officer found a single spent shell casing in the street on Lincoln Lane and found footprints in the area that matched the shoes Pinon and Zaragoza were wearing.

## III. Tape recording in back of police car

After Pinon and Zaragoza were arrested, a police investigator secretly placed his recorder in the back of a police car and turned it on. Pinon and Zaragoza were then placed in the back of that car together by themselves.

On the recording, Pinon could be heard singing, "I'm going to county. I'm going to county. I'm going to county-bound—county-bound … I don't give a fuck, either." Pinon asked Zaragoza, "What's your charges? Attempted homicide?" Zaragoza answered, "Yeah." Pinon asked, "Did we hit him?" Zaragoza replied, "I guess, yeah."

Pinon and Zaragoza discussed that they did not think they would be placed in the same pod together at the jail. They also discussed how they would tell the jail staff they were "Northern Hispanics," and discussed the length of time they would likely have to spend in custody. Zaragoza said, "Man, we're going to be locked up for a long time, huh, bro?" Pinon replied, "Yeah, G, we are." Pinon added, "We just need to take the best deal, bro," and, "We fucked up, G."

Zaragoza asked Pinon, "They tested your fingers? Is it positive for the gun residue?" Pinon replied, "I don't know, probably. They already did that shit." Zaragoza said, "We gonna be on the newspaper, bro, our face."

## IV.    Gang expert testimony

Kings County Sheriff's Sergeant Taylor Lopes testified as an expert in the Brown Pride Nortenos ("BPN") and Huron Park Side Nortenos ("HPN") criminal street gangs. BPN and HPN are two Kings County subsets of the Norteno criminal street gang. BPN is made up of members from Lemoore and Stratford, and HPN originated in nearby Huron, but many HPN members had recently begun moving to Lemoore. BPN and HPN are part of the Norteno hierarchy led by the Nuestra Familia prison gang. Norteno rivals include Sureno, Crip, and Bulldog gang members.

Norteno gang members are required to pay into the prison gang system a portion of the money they make through their criminal enterprises. The primary activities of BPN and HPN include assault, weapons trafficking, narcotics trafficking, human trafficking, vehicle theft, vandalism, robbery, and witness intimidation. Robberies are primarily committed to make money for the gang, but also benefit the gang by instilling fear in the community. Members of BPN and HPN socialize and commit crimes together, and share unifying symbols and signs—including the color red, the number 14, and the letter N.

The prosecution presented evidence of several predicate gang offenses, including a September 2014 incident where Pinon, Zaragoza and others were convicted of assault with a deadly weapon and robbery. In that incident, the defendants beat up and robbed a rival Crip gang member. Lopes explained that fear and intimidation is "everything" to a gang. A gang member committing a robbery gains respect and the crimes bolster their status in the gang. An armed robbery or a shooting during a robbery increased the fear and intimidation factors.

7.

Lopes also explained that Norteno gang members commonly engage in witness intimidation. Members will attend the trials of fellow Nortenos to either dissuade them from testifying or to make witnesses feel uncomfortable while testifying. Attending the trial of a fellow Norteno is also a way for a member to show support for his fellow member facing trial.

Lopes opined Pinon was a member of HPN and Zaragoza was a member of BPN. Zaragoza had a number of gang-related tattoos, including "beast" on one hand and "mode" on the other. "Beast mode" is a common Norteno phrase and tattoo. Zaragoza also had an "L" tattoo representing Lemoore, which is a common tattoo among BPN members from Lemoore. Pinon had a large "P" tattoo, common for HPN.

Zaragoza also had multiple prior gang-related police contacts. In April 2014, Zaragoza was caught graffitiing four dots and "BPN" on a wall at Lemoore High School and he told a campus supervisor that he "banged." Zaragoza and Pinon's Facebook accounts also contained gang-related content. Zaragoza's account was under the name "Jimmy Zaragoza 14" and his profile picture was a red flag with a Huelga bird on it and a hand displaying an "L" hand sign. The caption on the picture read, "Love my hood #Lemos BPN." The Huelga bird is a common Norteno symbol. There was a post on Pinon's Facebook account from September 2014 in which he bragged about committing the assault and robbery that served as the basis of one of the predicate offenses at trial. The post comprised a photograph with Pinon, Zaragoza, and two other men named Martin and Nicholas. The photograph depicts the young men posing, and the caption on the post read: "HpN 2 WcN :: fucked that crab up took hiz shit….#Lil[redacted] #talkshitNow".[5] "Crab" is a slur Nortenos have for Crip gang members.

---

[5] We inserted the word "redacted" in place of the victim's full name to protect the victim's identity.

Lopez offered an explanation of the audio recording from the back of the police car when Pinon and Zaragoza were arrested. He explained Pinon and Zaragoza sounded happy they were going to jail because committing a violent crime elevates one's status in the gang. Lopes further opined based on a hypothetical paralleling the facts of this case that the attempted robbery and shooting were committed for the benefit of, at the direction of, and in association with the Norteno criminal street gang. He explained the robbery would benefit the gang financially by bringing in money and by instilling fear in the community and rival gangs. Instilling fear in the community and rivals is beneficial because it allows a gang to control territory and discourages people from reporting crimes to the police for fear of retaliation. Norteno gang members, as part of their education and indoctrination in the gang, are directed by gang leadership to commit crimes to benefit the gang. Lopes also explained that, in the hypothetical posed to him, the gang members would take the older man's (which would be B.) standing up to them as disrespect. The gang members would lose credibility if they allowed the older man to get away with disrespecting them.

**DISCUSSION**

**<u>Meritorious claims</u>**

**I.     The section 186.22 gang enhancements must be reversed**

After sentencing, but while this appeal was pending, the Legislature enacted Assembly Bill No. 333 (AB 333), which significantly modified the requirements to prove a gang enhancement under section 186.22, effective January 1, 2022. (*People v. Sek* (2022) 74 Cal.App.5th 657, 663, 665 (*Sek*).) Zaragoza argues that the amendments apply retroactively to his case, and that, because the jury convicted him under the prior version of the law, the gang enhancements must be reversed. The People agree, as do we.

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony "committed for the benefit of, at the direction of, or in association

9.

with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members[.]" (§ 186.22, subd. (b)(1).)

Before AB 333 was enacted, the statute defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons, … having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f); Stats. 2017, ch. 561, § 178.) To establish a "pattern of criminal gang activity," the prosecution needed to prove only that those associated with the gang committed two or more predicate offenses within a period of three years and that the offenses were committed on separate occasions, or by two or more persons on the same occasion. (*Menifee v. Superior Court of Santa Clara County* (2020) 57 Cal.App.5th 343, 362.) A predicate offense could be established by evidence of the charged offense, and, in most cases, it was unnecessary to prove that the predicate offenses were gang related. (*Ibid.*; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 (*Rodriguez*); *People v. Garcia* (2020) 46 Cal.App.5th 123, 165.)

AB 333 increased the evidentiary requirements to prove a gang-related enhancement in several respects. First, AB 333 narrowed the definition of " 'criminal street gang' " to "an ongoing, organized association or group of three or more persons … whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The statute now requires the prosecution to prove that two or more gang members committed each predicate offense. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).)

Second, AB 333 created stricter requirements to prove "a pattern of criminal gang activity." Under the new legislation, (1) the last predicate offense must have occurred not only within three years of the prior predicate offense, but also within three years of the date of the currently charged offense, (2) the predicate offenses must have "*commonly*

benefited a criminal street gang," and that benefit must be "*more than reputational*," and (3) the currently charged offense cannot be used as a predicate offense. (§ 186.22, subds. (e)(1)—(2), (g), italics added; *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*); *Rodriguez, supra,* 75 Cal.App.5th 822—823.)

The parties agree, as do we, that AB 333's changes apply retroactively to Zaragoza's case. Under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), absent evidence to the contrary, we presume that the Legislature intended such ameliorative changes to the criminal law to apply to all criminal cases not yet final on appeal. (*Id.* at pp. 744—746; *People v. Nasalga* (1996) 12 Cal.4th 784, 792; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) AB 333 is an ameliorative amendment that increases the threshold for imposition of a gang enhancement. (*Lopez, supra,* 73 Cal.App.5th at p. 345; accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.) Because AB 333 is silent regarding retroactivity, under *Estrada*, we presume it applies retroactively to all nonfinal cases on appeal, including this one. (See, e.g., *Lopez*, at pp. 343—344; *Sek, supra,* 74 Cal.App.5th at p. 667.)

Here, it is undisputed the evidence presented at trial was insufficient to prove the gang enhancements under the new law. The People concede this. The People did not present evidence to prove the offenses commonly benefited the gang in a manner that was more than reputational. There was evidence the attempted robbery was committed for Zaragoza's and Pinon's financial benefit, but insufficient evidence that crime was to commonly benefit the gang financially. In addition, the jury was not prohibited from relying upon the currently charged offenses to establish a predicate offense. Moreover, under the new law, the last predicate offense must have occurred within three years of the date of the currently charged offense. Thus, the September 2014 incident could not be used as a predicate offense under the new law because it happened more than three years before the crimes in this case.

11.

In sum, the jury was not asked to, and therefore did not make, the factual determinations now required to impose a gang enhancement under section 186.22. We therefore conclude the gang enhancements must be vacated, and the matter remanded to give the People an opportunity to retry the gang enhancements under the amended law. (*E.H., supra,* 75 Cal.App.5th at p. 480; accord, *Lopez, supra,* 73 Cal.App.5th at p. 346; *Sek, supra,* 74 Cal.App.5th at p. 669; *Rodriguez, supra,* 75 Cal.App.5th at p. 823, fn. 19.)

### *Bifurcation*

At trial, Zaragoza moved to bifurcate trial on the gang enhancement allegations, which the court denied. He contends this was reversable error under newly enacted section 1109 and argues his convictions on the underlying offenses as well as the findings on the enhancement allegations must all be reversed. We disagree.

AB 333 added section 1109, which requires gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

Zaragoza contends section 1109 applies retroactively. This court recently held in *People v. Ramos* (Apr. 27, 2022; F080916) __ Cal.App.5th __ (*Ramos*) that section 1109 applies retroactively to cases not yet final on appeal. (*Ramos*, at p. [22].) However, the failure to bifurcate the gang enhancements from the trial on the underlying charges is reviewed for prejudice under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836); that is, reversal is only required if "it is reasonably probable [Pinon] would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancement been bifurcated." (*Ramos,* at pp. [24—25].)

12.

Here, we cannot conclude Zaragoza was prejudiced by the failure to bifurcate the gang enhancements because the evidence of the underlying charges was overwhelming. B. heard Pinon ask Zaragoza for the gun, and then saw Pinon point the gun at and shoot him. B. also positively identified Zaragoza in court, and Zaragoza's shoeprints were found in the area. Additionally, although Pinon was convicted of attempted premeditated murder, Zaragoza was only convicted of attempted voluntary manslaughter. The reason for this discrepancy in the verdicts is not readily apparent to us, but clearly Zaragoza's verdict was the much more favorable one. All things considered, we are not convinced it is reasonably probable Zaragoza would fare any better on a bifurcated retrial on the underlying offenses.

## II. Assembly Bill No. 124 and Senate Bill No. 567

While this appeal was pending, the Legislature enacted Assembly Bill No. 124 (AB 124) and Senate Bill No. 567 (SB 567), which both became effective January 1, 2022. Among other things, AB 124 establishes a presumption that the trial court will impose the lower term under specified circumstances, including, as relevant here, when a defendant was under 26 years of age at the time of the offense and that was a contributing factor in the commission of the offense. (§ 1170, subd. (b)(6)(B), added by Stats. 2021, ch. 695, § 5.) SB 567, among other things, generally limits the trial court's ability to impose the upper term unless aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the court in a court trial. (§ 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.) Evidence of the defendant's prior convictions, in the form of certified records of conviction, is an exception to this general rule and need not be submitted to a jury. (§ 1170, subd. (b)(3), added by Stats. 2021, ch. 731, § 1.3.) The parties agree these amendments apply retroactively to Zaragoza because his conviction was not final when this legislation took effect. (See *People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

13.

Zaragoza was sentenced to the upper term of three years for attempted robbery (count 2). He also received the upper term of five years, six months for the attempted voluntary manslaughter (count 1), which was stayed pursuant to section 654.

In imposing the upper term on count 2, the court stated:

> "All right. Based upon the specific findings of the jury and the circumstances laid out in the probation officer's report, as well as the comments of counsel and the comments by the Court, as to Count 2, I will sentence the defendant to the upper term of three years. The gang enhancement under 186.22(b)(1) will be five years, but that's stayed by operation of law since I'm imposing the ten-year term under Penal Code Section 12022.53(b). So it will be a total term of 13 years on that case—on that count."

The probation officer had listed circumstances in aggravation to include: the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, in that Zaragoza threatened the officer while performing his duties;[6] the victim was particularly vulnerable, in that he was out numbered and shot while running away and struck in the back by a bullet and had no way to protect himself; Zaragoza was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed; Zaragoza has engaged in violent conduct, which indicates a serious danger to society; and Zaragoza's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness. The probation officer found one fact in mitigation: Zaragoza has no prior record, or an insignificant record of criminal conduct, considering the recency and frequency of prior crimes.

---

[6] While there was no objection and no party mentions it on appeal, we do not see anything in the record indicating Zaragoza ever threatened an officer. This is something that we point out to aid the court on remand.

14.

It is undisputed the court, in imposing the upper term on count 2, relied on aggravating factors that were neither admitted nor found true beyond a reasonable doubt. (See § 1170, subd. (b)(2), added by Stats. 2021, ch. 731, § 1.3.)  Further, the court could not have considered, at the time of sentencing, subdivision (b)(6)(B) of section 1170, which provides that, "[n]otwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶] ... [¶] (B)  The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."  (§ 1170, subd. (b)(6)(B), added by Stats. 2021, ch. 695, § 5.)  A "youth" as defined in subdivision (b) of section 1016.7 "includes any person under 26 years of age on the date the offense was committed."  It is undisputed Zaragoza was 18 years old at the time he committed his offenses.

We agree with the parties that remand is appropriate so the trial court may fully resentence Zaragoza in light of changes effected by AB 124 and SB 567.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

## III.   Assembly Bill No. 518

The parties also agree Zaragoza is entitled to the benefit of newly enacted Assembly Bill No. 518 (AB 518) when he is resentenced.

Prior to its amendment by AB 518, section 654 provided:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (Former § 654, subd. (a).)  AB 518 amended section 654 effective January 1, 2022, to provide, in

15.

relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), added by Stats. 2021, ch. 441, § 1.) Thus, a trial court is no longer required to impose a sentence under the crime providing for the longest possible sentence but may sentence a defendant under any one of the applicable crimes.

Absent a contrary showing, we presume the trial court followed section 654 as it existed immediately prior to January 1, 2022, in sentencing Zaragoza. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496—497; Evid. Code, § 664 [presumption that official duty has been regularly performed].) The current version of section 654 "provides the trial court new discretion to impose a lower sentence[.]" (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*).) As with SB 567, there is no indication that the Legislature did not intend AB 518 to apply retroactively to a defendant whose case is not yet final. Accordingly, a defendant whose case is not yet final is entitled to its benefit. (*Mani,* at p. 379; *Estrada, supra,* 63 Cal.2d at pp. 744—746.)

Zaragoza was sentenced to the upper term of three years for attempted robbery (count 2), plus 10 years for the accompanying gun enhancement, for a total term of 13 years. The court also imposed but stayed a term of 10 years, six months on the attempted voluntary manslaughter count (count 1) pursuant to section 654. In sentencing Zaragoza on counts 1 and 2, the court was required to follow former section 654 and impose the 13-year term of imprisonment from count 2 and stay the term for count 1. With the passage of AB 518, the trial court now has discretion in this case to choose a term of incarceration applicable to either count 1 or 2, while staying the term applicable to the other count. Zaragoza is entitled to the benefit of AB 518 upon resentencing.

## IV. Section 12022.53, subdivision (d), enhancement

Zaragoza claims remand is required so the trial court can consider whether to strike the section 12022.53, subdivision (d), enhancement or reduce the sentence. The People agree, as do we.

While this appeal was pending, the Supreme Court issued *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), which resolved a split of appellate authority concerning whether a court may impose a lesser uncharged firearm enhancement under section 12022.53, subdivisions (b) or (c) after striking a firearm enhancement under subdivision (d). *Tirado* concluded that "[w]hen an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed ... the court may ... impose an enhancement under section 12022.53(b) or (c)." (*Tirado,* at p. 700, fn. omitted.)

The parties agree Zaragoza is entitled to the retroactive application of the *Tirado* decision, which was decided while his nonfinal case was pending on appeal. (*People v. Guerra* (1984) 37 Cal.3d 385, 400 [appellate opinion ordinarily governs all cases still pending on direct review when rendered].) On remand, the trial court shall exercise its sentencing discretion consistent with *Tirado*.

## Other issues

## V. The evidence sufficiently proved attempted voluntary manslaughter

To be guilty of attempted voluntary manslaughter under an aiding and abetting theory, as was Zaragoza, a defendant must also have had the specific intent to aid and abet a killing. Zaragoza claims there was insufficient evidence he acted with this intent. We disagree.

When considering a challenge to the sufficiency of the evidence to support a conviction, " " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

17.

credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 632 (*Lee*).) We presume in support of the judgment " " 'the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Attempted voluntary manslaughter requires the specific intent to unlawfully kill, and a direct but ineffectual act toward killing the victim. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549—1550.) It is well-established that the intent to kill may be inferred from the defendant's acts, and from the circumstances of the crime. (*People v. Lee* (1987) 43 Cal.3d 666, 679.)

"There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime.' " (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), partially superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.) " 'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) To be guilty of attempted voluntary manslaughter as an aider and abettor, then, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted voluntary manslaughter as an aider and abettor must intend to kill. (See CALCRIM

18.

No. 401 [aiding and abetting of intended crimes] and No. 603 [attempted voluntary manslaughter].)

" 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*Nguyen, supra,* 61 Cal.4th at p. 1054.) " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*Id.* at p. 1055.)

" 'Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chiu, supra,* 59 Cal.4th at p. 158.)

Only the first form of aider and abettor culpability is relevant in this case. We find there was sufficient evidence to prove Zaragoza aided and abetted Pinon with a specific intent to kill B. Zaragoza, who was 18 years old and with his friend of the same age, was the first to approach 67-year-old B. to demand B.'s wallet. B. refused to give up his wallet, and admonished Zaragoza he should get out of the neighborhood before he got in trouble. B. then ended the conversation with Zaragoza and began to ride away. Thus, Zaragoza's attempt to steal B.'s wallet was a failure. From Zaragoza's perspective, it would seem B. treated him like he was nothing to worry about—signifying a lack of respect and lack of fear. Lopes testified fear and intimidation are "everything" to a gang.

After disengaging from Zaragoza, B. was aggressively approached by Pinon. Apparently unintimidated by Pinon as well, B. got off his bicycle and told Pinon he would "kick [his] fucking ass" right then and there if Pinon wanted. Seeing Pinon apparently did not want a fist fight, B. got on his bicycle and ended the encounter by riding away. At no point during the incident did B. show he was scared of or intimidated by Pinon and Zaragoza. Lopes testified that a Norteno gang member would lose credibility were he not to respond to an act of disrespect.

19.

A reasonable jury could have found Zaragoza and Pinon both felt very disrespected and even emasculated by the fact that 67-year-old B. (who was by himself) was apparently unafraid of the two of them. It was not just that B. was unafraid, but that he challenged one of them to a fist fight, and the challenge went unaccepted. The jury could have inferred both Zaragoza and Pinon—being members of a violent street gang that feeds off fear and intimidation, having just had their pride wounded, and now faced with the prospect of losing face within the gang—developed an intent to shoot B. with the intent to kill him. The killing would have been revenge for B.'s disrespect and a means of saving crucial face within the gang. Additionally, Lopes testified that shooting a person during a robbery would result in a large boost in one's status in the Norteno gang.

In conclusion, the circumstances supported a finding that Zaragoza knew Pinon intended to shoot and kill B. when Pinon asked him for the gun, and that Zaragoza gave Pinon the gun with the specific intent to aid Pinon in attempting to kill B. When Pinon and Zaragoza were in the back of the police car together, Zaragoza did not say anything indicating he was not trying to kill B. Zaragoza did not scold Pinon for shooting B. or express any regret about the incident. Considering all the circumstances surrounding the shooting in conjunction with Lopes's expert testimony, there was sufficient evidence to support Zaragoza's attempted voluntary manslaughter conviction.

## VI.    CALCRIM No. 401 is not defective

Without having objected below, Zaragoza argues the instruction given on the aiding and abetting theory of voluntary manslaughter was prejudicially incomplete because it did not make clear that Zaragoza had to share Pinon's specific intent to kill B. The People contend the issue was forfeited. We reject the claim on the merits.

We apply the de novo standard of review in assessing whether jury instructions correctly state the law, reviewing the instructions as a whole. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134—1135.)

20.

The court gave CALCRIM No. 400, the pattern instruction on aider and abettor liability. This instruction informed the jury that "[a] person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

The court also gave CALCRIM No. 401which provided in pertinent part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. *Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime*; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] *Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime*." (Italics added.)

Zaragoza argues the instruction omitted the requirement that he had to share Pinon's criminal purpose. To the contrary, the third element in CALCRIM No. 401 clearly included that requirement.

A similar argument was rejected in *People v. Stallworth* (2008) 164 Cal.App.4th 1079 (*Stallworth*), in which the appellant contended that CALCRIM No. 401 did not explicitly state that mere presence or mere knowledge is insufficient to establish aiding and abetting. The *Stallworth* court concluded that the language of CALCRIM No. 401 "demonstrates otherwise." (*Id.* at p. 1103.) It reasoned: "CALCRIM No. 401 clearly provides that knowledge that the perpetrator intends to commit the crime is only one of the four elements for aiding and abetting liability. If the jury found mere knowledge alone, by the terms of CALCRIM No. 401, that would be insufficient to establish aiding

21.

and abetting liability.  This point is even emphasized by the portion of the instruction that reads as follows:  'Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.' (CALCRIM No. 401.)"  (*Ibid.*, italics omitted.)

As the *Stallworth* court concluded, we also conclude that CALCRIM No. 401 clearly and correctly informed the jury that it was required to find that Zaragoza acted with the intent to aid, facilitate, promote, encourage, or instigate Pinon's attempt to kill B.  There was no error in the instruction on aiding and abetting.

## VII.   No error in denying request for lesser included offense instruction

Zaragoza claims the trial court erred in failing to instruct the jury on assault with a deadly weapon as a lesser included offense of attempted murder with a firearm use enhancement.  We disagree.

A trial court has a duty to instruct on lesser included offenses, "when the evidence raises a question as to whether all of the elements of the charged offense were present ...." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  " 'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' "  (*People v. Jennings* (2010) 50 Cal.4th 616, 667—668; see *People v. Martinez* (2012) 208 Cal.App.4th 197, 199.)  On appeal, a defendant's claim that the trial court failed to instruct on a lesser included offense is subject to de novo review.  (*People v. Booker* (2011) 51 Cal.4th 141, 181; *People v. Licas* (2007) 41 Cal.4th 362, 366.)

Neither the statutory elements of attempted murder, nor the facts actually alleged in the accusatory pleading, include all the elements of assault with a deadly weapon.  As its name suggests, assault with a deadly weapon requires use of a "deadly weapon or

instrument." (§ 245, subd. (a)(1).) Murder has no such requirement (§ 187, subd. (a)), and the attempted murder charge in the information did not allege that Zaragoza used a deadly weapon or instrument. Although the information included a firearm use enhancement allegation as to the attempted murder count, the California Supreme Court held in *People v. Wolcott* (1983) 34 Cal.3d 92 that such enhancements must not be considered in determining lesser included offenses. (*Id.* at p. 101.) The trial court, therefore, was not required to instruct on assault with a deadly weapon as a lesser included offense.

Zaragoza also raises an unconvincing alternative argument. We perceive it to be: the trial court should have instructed the jury on the elements of assault with a deadly weapon as a lesser included offense, but without providing a verdict form for assault with a deadly weapon, and should have explained the jury was not being provided a verdict form for that offense because the prosecution chose not to charge it. He contends the defense's theory at trial was that he was only guilty of assault with a deadly weapon, and the failure to instruct the jury on the elements of that offense deprived him of his right to a fair trial. We reject the argument.

Zaragoza admits that a similar contention was raised and rejected in *People v. Valentine* (2006) 143 Cal.App.4th 1383, but asserts we should not follow that case's reasoning. In *Valentine*, the defendant was convicted of robbery. The defendant's theory at trial was that he was only guilty of receiving stolen property, and he requested an instruction on the crime of receiving stolen property to support his defense. The trial court did not give the instruction. He argued on appeal he should have been allowed to argue that he was guilty only of an uncharged lesser related offense, and that the jury should have been instructed on the elements of that offense. The Court of Appeal rejected the argument, explaining the commission of a lesser related offense is not a true defense to the charged offense and, therefore, failure to instruct on the lesser offense did not impinge on the defendant's right to present a defense. (*Id.* at pp. 1387—1388.) We

23.

see no reason to disagree with *Valentine's* holding and reasoning, and we thus reject Zaragoza's alternative argument.[7]

## VIII.  Claim of juror bias

Zaragoza contends he was deprived of his constitutional right to a fair trial by an impartial jury because the trial court failed to adequately question jurors regarding alleged juror intimidation attempts and erroneously denied his two mistrial motions.  He also relatedly claims his counsel was ineffective for failing to request, at the time of the second mistrial motion, that the trial court individually question each juror regarding the potential effect of any alleged intimidation.  We reject his claims.

### A.     Background

On the fourth day of trial, during a recess in the prosecution's case-in-chief, the court informed counsel:  "[A] female person who was in attendance in this court during the trial apparently walked out, walked onto the staircase and started taking photos of the jurors, at least one of the jurors noted that.  That person is now in custody going to jail."  The court then informed the audience:  "Ladies and gentlemen who are here, unless you want to join her, do not in any way use a cellphone to record or document anything that is going on in this courtroom."

The jurors returned to the courtroom and the trial court said to them:

> "Ladies and gentlemen of the jury, we took a little bit longer, the Bailiff has informed me that one or more of you may have seen somebody attempting to take a photograph through that window, that person is now in custody on their way to jail.  As you can see we have put down that shade I guess is what it is called to prevent anything further.  More importantly we also have additional security.  With that in mind do not let that fact or what happened with that person attempting to take the photographs influence your decision in this case in any way.  That is very important.  You cannot

---

[7] We also observe that, as relevant to *Valentine*, receiving stolen property is a lesser included offense of robbery.  Contrarily, as we have already explained, assault with a deadly weapon is not a lesser related offense of attempted murder with a firearm enhancement.  Thus, *Valentine* is distinguishable for this fundamental reason as well.

allow that to come into your discussions.  You cannot allow that to be influencing your decision in any way.  The reason why I am telling you this is, one, because you noticed it.  And two, to assure you we have taken appropriate measures to remedy it.  But after that you just can't use it for any other purpose.  If you have any other concerns about your security, just check with the Bailiff and we'll make all of you accommodations."

Later that day, during a recess, Pinon's counsel moved for a mistrial based on this incident with the female photographing jurors.  Counsel expressed concern the jurors "are possibly going to use that against our clients, and contribute [*sic*] it to them even though the Court did advise them not to."  The court denied the motion, stating:  "We have taken appropriate action, I admonished them not to consider it, I have no reason to believe that they would not follow my directions.  If you wish I could admonish them again and ask each and every one of those jurors if they can't follow that admonition."  Pinon's counsel declined the offer of additional admonitions and questions, explaining, "I think that would just draw more attention to it."

The following morning, juror number four reported he had seen a young woman who he thought may have been taking photographs of him with her cell phone while he was outside exercising the morning before.  The juror was called into the closed courtroom—without the other jurors, the defendants, or any spectators present.  The juror reported:

> "Usually in the mornings I take my dog for a walk, and then twice a week I jog the same distance before I take him for the walk.  Since the incident yesterday it came to my mind I thought it was strange there was a Nissan, dark SUV and there was a female young driver with an iPhone taking a picture of me.  So I thought it was pretty strange because you're not supposed to use the phone when driving, and somebody pointed a camera and I couldn't tell if she was texting or whether—but it was pointed at me, so I thought I will just report it."

The court stated it was good for the juror to report it, and asked:  "Is that in any way going to prevent you from continuing on as a juror?"  The juror responded:  "Absolutely not.  I mean, I will continue."  The court then stated:  "What I need you to do

25.

is two things.  One, do not share that with any other jurors.  [¶]  And second, do not let it enter into your deliberations or analysis of the case.  The case has to be decided based on the evidence presented here, the arguments of counsel, and the instructions I give you.  [¶]  Sir, can you follow that?"

The juror responded he could follow the instructions, but stated:  "Unfortunately I shared the information with the another [*sic*] juror.  I told them that something strange happened."  The court asked, "So all the other jurors know?"  The juror responded that they did know.  The court then told the juror it was not his fault and sent him back to the jury room.

The court then called juror number seven into the courtroom, who had reported she was experiencing a hardship due to stress.  The courtroom was still "closed" when juror number seven entered the courtroom.  The court told the juror it had learned she had something she wanted to share, and the juror said she did.  The following colloquy ensued:

> "[THE JUROR]:  I am just really uncomfortable, because when we were in here choosing, I gave the name of our business, which is our home.  The address is associated with our home, and there were people in here that were not just here for jury duty, and I am really uncomfortable about it.  I have children, my house has a big sign in front of it that says the name of our business on it.  I am not—

> "THE COURT:  Is there anything we can anything to do of lessening these concerns?

> "[THE JUROR]:  I am not necessarily—I just don't know if I could give a fair judgment based on that because of the act or—that is my concern.  I mean, we already have people taking pictures, and I just can't— I have children, and that is my—my address.  And I was one of the last people that was talked to.  I said that, and then I was sworn in like almost immediately after that, so I can't be sure that anybody that was here listening didn't remember that.  And I just don't know if I could be fair, because I am scared."

The court then asked the juror if she could still carry out her duties as a juror, and she said she could not on this case. The court noted she was visibly in tears, and the juror said she had not been eating very much and not feeling well. The court stated it "will find by a demonstrable reality that she has indicated she is clearly upset, is unable to continue to perform her duties as a juror in this case." The juror told the court she had not discussed her concerns with any of the other jurors. The court dismissed juror number seven.

The court then brought the rest of the jurors into the still "closed" courtroom and swore in an alternate juror.[8] The court then told all the jurors:

> "All right, thank you. All right, I talked to juror number four seated in seat number four, he indicated a related incident that he saw yesterday morning, and he indicated to me that he unfortunately shared that with the rest of you, sort of similar to what we had yesterday, but I wanted to bring you all out to make sure that—to again advise you that having learned of that incident from your fellow juror that you are not to consider that for any purpose whatsoever. You can't let it enter into your deliberations to your discussions, cannot be part of any verdicts reached in this case. Your verdicts must be based solely on the evidence that is presented here in court, the exhibits admitted. You will get to hear the arguments of counsel, and then the jury instructions, which will be the law in this case. It could only be based on that. Can all of you follow that instruction? Nodding their head. Anybody indicate they could not follow? No responses. Thank you for that."

The judge sent the jury back into the jury room.

Pinon's counsel moved for a mistrial based on the information received from jurors number four and seven. Counsel noted juror number seven looked upset, and argued that the information they received from juror number four about his photograph being taken, in combination with the incident the day before with the woman in the courtroom taking pictures of the jurors, made it such that the jurors "[could not] possibly

---

[8] We note that the trial court did not tell the other jurors why juror number seven had been dismissed.

27.

put that out of their minds." Counsel asserted the jurors would use this information against the defendants in reaching verdicts, thereby depriving the defendants of their right to a fair trial. Zaragoza's counsel joined the motion.

The court denied the motion, stating: "I specifically questioned the jurors if they could follow the admonition I gave, they all nodded in the affirmative. No one indicated, unless they are lying to me, I believe they set that aside and fairly and truly try this case until the opposite is shown, that motion is denied."

## B. Applicable law and analysis

"An accused has a constitutional right to a trial by an impartial jury.... An impartial jury is one in which no member has been improperly influenced ... and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293—294 (*Hamilton* ), citations omitted.) " ' "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors ..., it is settled that a conviction cannot stand if even a single juror has been improperly influenced." ' " (*People v. Nesler* (1997) 16 Cal.4th 561, 578.)

Juror misconduct may occur where an overt event directly violates actual or prospective jurors' duties and admonitions, such as when a juror consciously receives outside information, discusses the case with nonjurors or conveys improper information to the other jurors. (*Hamilton, supra,* 20 Cal.4th at p. 294.) Where the event involves a claim of juror intimidation, "[a] sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*Id.* at pp. 294—295; accord, *People v. Harris* (2008) 43 Cal.4th 1269, 1303 (*Harris*).) "[A] nonjuror's tampering conduct or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice." (*Hamilton, supra,* at p. 295.)

We resolve the question whether an individual verdict must be overturned for jury misconduct or irregularity pursuant to an objective, substantial likelihood test. (*Harris, supra,* 43 Cal.4th at p. 1303.) "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Hamilton, supra,* 20 Cal.4th at p. 296.) "We independently determine whether there was such a reasonable probability of prejudice." (*Harris, supra,* at pp. 1303—1304.) In making this inquiry, our Supreme Court has cautioned: "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.].... 'If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' " (*Hamilton, supra,* at p. 296.)

On the basis of this record, we conclude there is no substantial likelihood that the jurors were actually biased against Pinon or Zaragoza as a result of any of the three incidents complained of: (1) the woman talking pictures in the courtroom, (2) the woman purportedly photographing juror number four, and (3) juror number seven's having to be dismissed mid-trial due to the stress caused by her home address having been stated in open court during jury selection. Thus, there was no error in denying both mistrial motions.

The first mistrial motion was made after the woman was caught taking photographs in the courtroom. The record is unclear as to who this woman was or as to the circumstances surrounding the incident. It is unknown whether she was affiliated with the defendants in any way, whether she was conspicuously or inconspicuously taking the photographs, or whether she had given menacing or intimidating looks or made

inappropriate gestures to the jurors. The court offered to question each of the jurors individually regarding their feelings about the incident, but Pinon's and Zaragoza's attorneys both declined the offer. Having refused the court's offer, Zaragoza's argument on appeal that the jurors were biased against him after this incident is based on pure speculation the jury was biased against him at the time the first mistrial motion was made. There is nothing in this record to undermine the trial court's finding upon the first mistrial motion that the jurors could follow the court's admonition and instructions to decide the case purely on the evidence and to disregard the incident involving the woman.

The court's denial of the second mistrial motion, made after jurors number four and seven were questioned and number seven was dismissed, was also proper. First, juror number four stated the incident with the woman in the SUV would "absolutely not" affect his ability to carry out his duties as a juror. Additionally, the jurors were all once again admonished and instructed to decide the case solely on the evidence, and the court asked all the jurors together whether anyone could no longer follow that instruction. None of the jurors said they could not follow the instruction, and nothing in the record indicates the jurors were not being forthright with the court. Further, juror number seven stated she had not told any other jurors about the stress she was experiencing, and the stress she was experiencing was very personalized in nature. She explained the stress was due to her business address, which was also her home address, having been stated in open court during jury selection. There is nothing in the record showing that any of the jurors in the courtroom also had their home addresses stated in open court or harbored similar worries for their personal protection.

Zaragoza argues juror number seven specifically referenced a certain male spectator in the audience who was allegedly in court to intimidate witnesses, but the record does not support that. Juror number seven said there were other people in the courtroom besides other prospective jurors at the time she stated her address during jury

30.

selection. There is nothing in the record establishing that certain male spectator was present for jury selection, nor any other indication of what persons, if any, juror number seven was concerned about. It is pure speculation to assert she was referring to the male spectator who the gang expert Lopes testified about.[9]

We conclude the record indicates no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were biased against Pinon or Zaragoza at any point in the trial, except for possibly juror number seven, who was dismissed. The trial court thus properly denied both mistrial motions.

Zaragoza also joins Pinon's related argument that their trial counsel was ineffective for failing to request a "full evidentiary hearing" when counsel made the second mistrial motion.[10] Citing *Remmer v. United States* (1954) 347 U.S. 227 (*Remmer*), Pinon contends he was entitled, upon his request, to a "full evidentiary hearing," a term he defines as comprising the trial court questioning each juror individually to uncover any potential bias.[11] However, neither *Remmer* nor any other authority we could find stands for the proposition that a criminal defendant is ever entitled to demand an individual questioning of each juror when possible juror intimidation is brought to the court's attention. *Remmer* stands only for the proposition that, in an instance of potential juror tampering, the trial court must hold a hearing, "with all interested parties permitted to participate," to determine whether the incident complained of was harmful to the defendant. (*Remmer,* at pp. 229—230.) *Remmer* does

---

[9] This spectator is fully discussed in section IX of the Discussion, entitled "Claim of spectator misconduct and witness intimidation".

[10] To prove ineffective assistance of counsel, a defendant must show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

[11] While Pinon does not specify whether he means the jurors should be questioned individually in the courtroom with the others remaining in the jury room, our analysis would not change in any event.

not hold that all the jurors must be questioned individually during the hearing, and we cannot find any California case so holding. Thus, the legal basis of Zaragoza's ineffective assistance of counsel claim—that counsel was ineffective for not requesting an individual questioning of all jurors—is invalid because no authority holds that he was entitled to the type of hearing he describes.

## IX. Claim of spectator misconduct and witness intimidation

Zaragoza argues the court erred in allowing the gang expert, Lopes, to testify that a spectator was in the courtroom to intimidate witnesses and that a witness was intimidated. We find no prejudicial error.

### A. Background

#### 1. The spectator

On the second day of trial, Lopes was testifying about BPN signs and symbols. The prosecutor asked Lopes if he had ever seen persons with dot tattoos by their eyes, and Lopes said he had. The prosecutor then asked Lopes:

> "[THE PROSECUTOR]: Can you see the second to the back row on the right side of the courtroom with the hair up in a bun, can you see his face?
>
> "[LOPES]: It is hard to see from here, but I saw them when they walked in.
>
> "[THE PROSECUTOR]: Do you see in [*sic*] tattoos on his face?
>
> "[LOPES]: Looks like four dots, but I can't see, I have to get closer.
>
> "[THE PROSECUTOR]: If the Court will allow him to get a little closer so he could see?
>
> "[THE COURT]: Certainly.
>
> "[LOPES]: Yeah, it is the same one that has been staring at me the whole time.
>
> "[THE PROSECUTOR]: Did you ever see tattoos like that as a gang investigator?

32.

"[LOPES]:  I do.

"[THE PROSECUTOR]:  And what sort of people do you see them on?

"[LOPES]:  Nortenos.

"[THE PROSECUTOR]:  So the 14, we already talked about that, that signifies the Nortenos?

"[LOPES]:  Yes.

"[THE PROSECUTOR]:  Why four dots?

"[LOPES]:  They will put a one and a four for 14.

"[THE PROSECUTOR]:  Is there a particular color that the Nortenos associate with?

"[LOPES]:  Red.

"[¶] … [¶]

"[THE PROSECUTOR]:  And fear and intimidation, is that part of gang culture?

"[LOPES]:  Fear and intimidation is everything to gangs….

"[THE PROSECUTOR]:  What are some various ways Nortenos try to instill fear and intimidation within others?

"[LOPES]:  You know, threats, assaults.  You know, tagging up their house with graffiti.  Shooting at them.  Shooting at their house, drive-by shootings.  There is various ways, really anything.

"[THE PROSECUTOR]:  You had testified there was an individual in the room with the four dots on his face, you said he was staring at you?

"[LOPES]:  Yeah.

"[THE PROSECUTOR]:  Did that catch your attention at all?

"[LOPES]:  It is common for other Nortenos to come and try to intimidate people within the courtroom."

On the fourth day of trial, the prosecution recalled Lopes after the jury was shown a video of a jail visit Zaragoza had with multiple people, including the male spectator the prosecutor pointed out. Lopes testified he recognized the spectator in the video. He noted from the video that the spectator had an "N" tattoo on his hand and was wearing red. The following colloquy ensued:

"[THE PROSECUTOR]: Do you recognize him?

"[LOPES]: Yes.

"[THE PROSECUTOR]: Where do you recognize him from?

"[LOPES]: He showed up in court the other day and he had the four dots on his eye. So again, he was here in the video and in the audience.

"[THE PROSECUTOR]: What is the significance of a Northerner assuming he is a Northerner coming to the trial of another Northerner?

"[ZARAGOZA'S COUNSEL]: Objection, he is making assumptions.

"[THE COURT]: Well, he personally witnessed that person coming, overruled.

"[PINON'S COUNSEL]: Objection, calls for speculation.

"[THE COURT]: Overruled, he is asking for an expert opinion.

"[LOPES]: I'm sorry, can you say the question again?

"[THE PROSECUTOR]: What is the significance assuming that the guy in the crutches with the four dots is a Northerner, him coming to the trial of another Northerner and observing and staring at you?

"[LOPES]: It is significant. They are going to show up. One of the main things they do is witness intimidation. Witness intimidation, they don't want people to show up to testify. They don't want law enforcement or anybody else to feel comfortable testifying. And it shows respect he is here representing and showing support for the defendants.

"[THE PROSECUTOR]: Do active Northerners ever come to court while victims are testifying?

34.

"[LOPES]: Yes.

"[THE PROSECUTOR]: And for what purpose?

"[ZARAGOZA'S COUNSEL]: Objection, this is way beyond the scope of expert testimony about what is in the mind of someone else.

"[THE COURT]: Is this part of your general background information and activities of the gang?

"[LOPES]: Yes, your Honor.

"[THE COURT]: Overruled.

"[LOPES]: Yes, they will. They are here to try and [dis]suade people from testifying."

Notably, the record does not indicate what days, or for how long, the male spectator was in the courtroom.

### 2.    *Lopes's testimony about Martin*

The prosecutor proceeded to ask Lopes questions about the testimony of Martin, who was one of the persons who committed the September 2014 assault and robbery with Pinon and Zaragoza and was pictured in Pinon's September 2014 Facebook post about it.[12]  Martin was called as a prosecution witness seemingly for the sole purpose of authenticating his (Martin's) record of conviction for the September 2014 offense. However, Martin was intractable and attempted to "plead the fifth" to most of the questions asked of him, even though the questions carried no risk of eliciting an incriminating response.  For example, when asked about his juvenile adjudication for the September 2014 robbery, he answered, "I do not want to incriminate myself.  I was arrested, I was a minor.  I didn't know what I was saying.  I didn't know what I was doing."

Martin denied ever being in a gang and denied committing any gang related crime. He explained that, since his juvenile adjudication, he had "proven [him]self since then

---

[12] Martin testified before Lopes was recalled.

35.

that [he is] not involved in any gang-related activity, and [that he] was never involved in any of that stuff." He further stated he has a career and would rather "do that peacefully without any involvement of whatever you guys got going on here." Martin's time on the witness stand was relatively short. Ambriz testified that in 2014 Martin told him he hung out with "HPN Northerners," but had recently moved to Lemoore and started hanging out with "Lemoore Northerners."

The following colloquy took place between the prosecutor and Lopes regarding Martin's testimony:

> "[THE PROSECUTOR]: Have you ever heard of the term snitching?
>
> "[LOPES]: Yes.
>
> "[THE PROSECUTOR]: What is snitching first of all?
>
> "[LOPES]: Snitching is when someone cooperates with law enforcement, testifies against somebody, provides a statement. Gang members are not allowed to talk, cooperate with law enforcement at all. If they do, they will potentially be killed, assaulted. And it is the ultimate act of treason and disrespect to another gang member. It is something that we deal with on [a] weekly basis.
>
> "[THE PROSECUTOR]: Did anything catch your attention about [Martin] and how he testified?
>
> "[LOPES]: Yes.
>
> "[THE PROSECUTOR]: What caught your attention?
>
> "[LOPES]: He was scared to testify. He doesn't want to say who he is. He—the thing that he says, I don't want any problems. Like I don't want to put myself in a bad position. He has to sit here in front of everybody and testify knowing he has to go out and live on the streets, that is something that none of us will truly understand until you interview somebody who has been targeted by a gang. It is—I can't even explain the life that they have to live once that happens. It is horrible."

Neither defendant objected to Lopes's testimony about Martin.

36.

## B. Relevant law

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801).' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*).) " 'Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ([Evid. Code, § 801], subd. (a).) The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion.' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944 (*Gonzalez*).) " 'Trial courts exercise discretion in determining both the admissibility of evidence under Evidence Code section 352 [citation] and a witness's expert status [citation].' " (*Ibid.*)

California courts "have long permitted a qualified expert to testify about criminal street gangs when the testimony is relevant to the case." (*Gonzalez, supra,* 38 Cal.4th at p. 944.) As particularly relevant here, the *Gonzalez* court stated: "Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury. 'It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes "respect." ' " (*Id.* at p. 945.) Further, " '[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court.' " (*Id.* at p. 946.)

Additionally, an expert may generally " 'render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' " (*Vang, supra,* 52 Cal.4th at p. 1045.) However, an expert may not testify about a specific

witness at trial and ultimately offer an opinion about his or her credibility.  (*Id.* at p. 1047.)

### C. Analysis

Zaragoza contends Lopes rendered two improper opinions.  First, he contends Lopes improperly opined as to the male spectator's intent to intimidate witnesses.  Second, he contends Lopes impermissibly testified Martin was scared to testify because he was intimidated.  He argues these improper opinions prejudiced him and infected the whole trial, requiring reversal of the entire verdict.  We conclude that there was nothing improper about Lopes's testimony about the spectator, and that Zaragoza's complaint about Lopes's testimony about Martin was forfeited.

### 1. *Regarding the spectator*

We first address Lopes's opinion regarding the spectator.  Zaragoza challenges the opinion Lopes gave in response to the prosecutor's question that asked him to assume the spectator was a Norteno and explain the significance of the spectator's presence in the courtroom.  He claims this was an impermissible opinion about a person's intent or other mental state.  But this was not an improper opinion because the question had an obvious hypothetical basis—that Lopes was to assume the spectator was a Norteno—and Lopes did not, in response to the question, offer an opinion as to anyone's intent or other mental state.  The jury was free to determine on its own that the spectator was not a Norteno, which would have invalidated the factual basis of the opinion.

Zaragoza also argues it was error to even draw attention to the spectator in the courtroom because the spectator's gang member status, relationship to Zaragoza, and his intentions "were not matters before the court."  First, we observe Lopes never opined the spectator was a Norteno gang member; Lopes only testified the spectator had common Norteno tattoos.  It would have been for the jury to determine whether the spectator was in fact a gang member.  Next, evidence of the spectator's gang membership status and evidence of witness intimidation being a primary activity of Nortenos were relevant to

38.

the evaluation of witnesses' credibility. "Under Evidence Code section 780, which concerns the scope of questioning at trial, a jury may consider 'any matter that has any tendency in reason to prove or disprove the truthfulness of [a witness's] testimony[.]' " (*People v. Merriman* (2014) 60 Cal.4th 1, 84.) The jury was allowed to evaluate the evidence presented—including the general background information regarding witness intimidation and the spectator's tattoos and jail visit with Zaragoza—and determine whether the spectator was engaging in witness intimidation and, if so, whether it affected any of the witnesses' testimony. Zaragoza has not demonstrated any impropriety with respect to this evidence.

## 2. *Regarding Martin's testimony*

It is widely recognized that the "failure to object to the admission of expert testimony … at trial forfeits an appellate claim that such evidence was improperly admitted. (Evid. Code, § 353, subd. (a); *People v. Eubanks* (2011) 53 Cal.4th 110, 142 [failure to object to hearsay in expert's testimony forfeits claim on appeal].)" (*People v. Stevens* (2015) 62 Cal.4th 325, 333; see *People v. Fuiava* (2012) 53 Cal.4th 622, 655 [noting a defendant "ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed himself or herself of the opportunity to bring them to that court's attention"].)

Although Zaragoza argues he may be excused from this general rule because an objection would have been futile (See *People v. Wilson* (2008) 44 Cal.4th 758, 793 [noting a "litigant need not object … if doing so would be futile"]), the circumstances in no way suggest an objection would have been futile. Specifically, he argues the futility lies in the fact that the court overruled both defendants' objections to Lopes's testimony regarding the significance of the spectator's presence in court. Zaragoza objected to the prosecutor's question of for what purpose do active Nortenos come to court while victims are testifying, which was made (at least in part) on the ground that the question called for Lopes to testify about a person's subjective intent. He argues that since the court

overruled that objection, it would have been futile to object to Lopes's statement that Martin was scared to testify.  We disagree.  Zaragoza's objection to Lopes's testimony about the spectator was properly overruled because it did not call for an opinion as to the spectator's intent; as the court indicated, it was a question that asked for general background information about Norteno activities.  Thus, the court did not, by overruling that objection, permit testimony about a person's intent or other mental state.  Therefore, the challenge to Lopes's testimony about Martin being scared to testify was forfeited.

## X.      Cumulative error

Zaragoza contends the cumulative effect of the errors in this case deprived him of due process and a fair trial in violation of his federal and state constitutional rights. " 'Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 365.)  There is no error in this case to accumulate.

### Moot issues

Zaragoza raises two other issues that relate only to the gang enhancement findings. Since we are reversing that finding due to recent legislative enactments, these two issues are moot and we need not address them.  Zaragoza contends his trial counsel was ineffective for failing to object (1) to testimony that amounted to witness vouching and (2) to testimony that amounted to statistical probabilities of guilt.

First, while Lopes was being cross-examined, the following colloquy took place:

"[ZARAGOZA'S COUNSEL]:  How many times have you testified as a gang expert in court?

"[LOPES]:  About ten times.

"[COUNSEL]:  Out of those ten times did you render an opinion as to whether or not the crime in the hypothetical you were given, whether or not it is for the gang?

"[LOPES]:  Yes.

40.

"[COUNSEL]: And every one of those occasions isn't it true that you testified always that in fact the crime was committed to benefit the gang?

"[LOPES]: In those cases I testified to, yes.

"[COUNSEL]: Have you ever testified on—as a gang expert where you did not opine the crime was committed for the gang, and the benefit of?

"[LOPES]: Usually that is dealt with before the case even goes to court.

"[COUNSEL]: So the answer is no?

"[LOPES]: No."

On redirect, the following exchange took place between Lopes and the prosecutor:

"[THE PROSECTOR]: Now [Zaragoza's counsel] also asked you if every time you have testified as a gang expert are you testifying that it is for the benefit of a gang and you said, no, that gets dealt with before court. If it is not for the benefit of a gang, could you explain that?

"[LOPES]: Yeah, I review every gang case that comes for—before it goes to the DA's Office, and I am well known amongst our guys of denying those cases, I have kicked back over a hundred cases that weren't. They were committed by gang members, but they're not being able to be prosecuted for that, or wasn't going to be at the benefit of or association with, they were committed by gang members, but they weren't cases to go to trial."

Zaragoza contends Lopes's explanation that how he "kicks" cases involving crimes committed by gang members but not for a gang purpose was inadmissible because Lopes effectively testified that he knew the crimes in this case were committed for a gang purpose, or else he would have said so before the case was even submitted for prosecution. Neither defendant objected at trial.

Second, when Lopes was recalled as a witness and was on cross-examination, the prosecutor asked: "Now wouldn't it be accurate to say that if individuals who are committing a crime for the benefit of a gang are not essentially advertising who they are,

41.

nobody is going to give credit to that gang?" Lopes replied, "No, they want their own credit." The prosecutor inquired, "So it is personal?" Lopes answered:

> "No, they want their own credit within that gang. The people that they rob don't give them credit. It is them putting in work. More than 60 percent if not higher of the crimes—gang crimes that we investigate, they do not brag about who they are, they report back to their gang about the work that they did. Because if they do every robbery, and every crime is a red rags, we're Nortenos and all the work they put in for the gang, if they advertise who they are, law enforcement is coming for them. They know that heat is going to come for them. Again that is—you know, it is more or less of a thing of the past. It still happens, but you see that on the TV more than in reality."

Zaragoza contends this testimony impermissibly offered a statistical probability of guilt relevant to the gang enhancement allegations. Again, neither defendant objected at trial.

Both issues are moot. An issue "is moot when any ruling by this court can have no practical impact or provide the parties effectual relief." (*Woodward Park Homeowners Ass'n v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.) We have vacated the gang enhancement findings on another ground, and therefore no additional benefit can accrue to Zaragoza by addressing either of these alternative grounds for reversal.

## DISPOSITION

The jury's true findings regarding the gang enhancements under section 186.22, subdivision (b)(1), are stricken. Zaragoza's sentence is vacated and this matter is remanded for further proceedings. The prosecution shall have the option to retry Zaragoza regarding the alleged gang enhancements. If the People do not bring Zaragoza to retrial within 60 days of filing the remittitur in the trial court pursuant to section 1382, subdivision (a)(2), or obtain a waiver of time by Zaragoza, the trial court shall resentence Zaragoza accordingly. At resentencing, the trial court shall exercise its discretion under AB 124, AB 518, SB 567, and *Tirado*. In all other respects, the judgment is affirmed.


                                                                    SNAUFFER, J.
WE CONCUR:


LEVY, ACTING P. J.


POOCHIGIAN, J.

43.